IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER RANDOLPH GISH,

                            Petitioner,

        v.                                          OPINION and ORDER

MICHAEL DITTMANN,                                   15-cv-730-jdp

                            Respondent.

Petitioner Christopher Randolph Gish pleaded guilty to first-degree reckless homicide in Milwaukee County Case No. 12-CF-3564, but he seeks a writ of habeas corpus under 28 U.S.C. § 2254 so that he can withdraw his plea. Although he admits that he committed the crime, he contends that his trial counsel was ineffective because counsel failed to investigate and inform Gish of a potential defense of involuntary intoxication. If Gish had known about that defense, he says, he wouldn't have accepted the state's plea deal and would have instead gone to trial, where he would try to show that he killed his girlfriend as a result of side effects from Xanax that he was taking under a doctor's prescription.

In an earlier order, I held that the Wisconsin Court of Appeals unreasonably applied federal law regarding ineffective assistance of counsel. Dkt. 22. I concluded that Gish should have had a hearing at which he could present evidence that his trial counsel was ineffective. On July 27, 2018, I held that hearing. The parties have submitted post-trial briefs and the matter is now ready for a decision.

To show that his trial counsel was ineffective, Gish must show both that counsel's performance was deficient, and that Gish was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668 (1984). I will assume that counsel performed deficiently by failing

to inform Gish of a potential defense of involuntary intoxication, but I will deny the petition because I conclude that Gish has not shown prejudice. Had trial counsel advised Gish about a possible involuntary intoxication defense, that advice would have to include an assessment of the prospects of success, which are essentially nil. Gish has some evidence that his conduct the night of the killing might have been influenced by the Xanax he was prescribed, but he has no evidence that he could not tell right from wrong, which is what he would have to prove for an involuntary intoxication defense. Under these circumstances, Gish hasn't shown that there is a reasonable probability that, had his trial counsel informed him of the defense, he would have decided not to plead guilty.

BACKGROUND

In the early morning of July 14, 2012, sheriff deputies found Christopher Gish wandering shoeless and incoherent near General Mitchell Airport south of Milwaukee, after he had crashed the minivan owned by his girlfriend, Margaret Litwicki. Gish was taken to a nearby hospital. Because Gish made statements about "blacking out and seeing red," the investigating officers called for a wellness check at the Greenfield address where the van was registered. Ex. 5, at 4. (Exhibits cited in this opinion are at Dkt. 41.) Police found Litwicki dead in the bedroom she shared with Gish. She had been stabbed repeatedly in the head, neck, and chest. After Gish was released from the hospital, he was taken to the Greenfield Police Department, where he was interviewed by detective Brent Hart. Gish at first denied any recollection of the crime, but ultimately he admitted to stabbing Litwicki because he believed she was having an affair and had threatened to leave him and take their children with her.

Gish was charged with first-degree intentional homicide in Milwaukee County Case No. 12-CF-3564. The charge carries a mandatory life sentence. Nathan Opland-Dobs, a lawyer

from the office of the State Public Defender, was appointed to represent him. On November 19, 2012, Gish pleaded guilty to first-degree reckless homicide, which carries a maximum prison term of 60 years but no mandatory minimum sentence. Wis. Stat. §§ 939.50(3)(b) and 940.02(1). The plea agreement allowed the parties to argue for whatever sentence they thought appropriate. The circuit court sentenced Gish to 40 years' confinement to be followed by 20 years' extended supervision.

Gish had wanted Opland-Dobs to raise Gish's use of Xanax as a defense, and shortly after sentencing he claimed that Opland-Dobs was ineffective because he did not do so. The procedural background of Gish's post-conviction proceedings is set out in my earlier order, Dkt. 22, so I won't repeat it here. The important point is that I concluded that Gish was entitled to a hearing where he would have the opportunity to present evidence that Opland-Dobs had been ineffective.

At the hearing in this court, Gish presented the testimony of three witnesses: pharmacology consultant James T. O'Donnell; Opland-Dobs; and Gish himself. The respondent presented the testimony of two witnesses: Kayla Neuman, a senior chemist in the toxicology section of the Wisconsin State Laboratory of Hygiene; and detective Hart. The parties stipulated to the admission of exhibits. All at Dkt. 41. From this evidence, I find the following facts.

On July 9, 2012, after a very brief consultation with his son's psychiatrist, Gish was prescribed three psychoactive medications, none of which he had taken before: Xanax, Lamictal, and Prestiq. Ex. 3 (pharmacy records). He went to fill the prescriptions the same day. The pharmacy was out of Prestiq, but he filled the prescriptions for Lamictal and Xanax, the latter of which Gish was prescribed to take three times a day. He took the Lamictal as

prescribed, but there is conflicting evidence about whether he took the Xanax on the day of the killing. At the hospital, he told a nurse that he had been prescribed Xanax, Lamictal, and Prestiq, but that he had "sold them for money." Ex. 16, at 10. During his interview with detective Hart, Gish said that he had taken the Lamictal "today sometime," but that he had last taken Xanax "a couple of days ago." Ex. 18, at 4. He also said that he "sold them" immediately after referring to his Xanax prescription and that he and his girlfriend "sell our pills to make money for rent." *Id.* at 4, 8.

No Xanax pills or bottles were found at the Gish/Litwicki residence, although police found bottles for four other prescriptions for Gish, including Lamictal. After he was charged, Gish told Opland-Dobs that he had taken both Xanax and Lamictal on the day of the killing. Gish testified at the hearing in this court that he had taken the Xanax as prescribed, and he could not explain why he told Hart anything different. When asked at the hearing why police didn't find Xanax at his residence, Gish said, "It should have been there."

Gish's blood was tested for the presence of alcohol, but no other drugs, and no alcohol was detected. Gish's testimony that he took no other drugs the day of the killing is unrebutted. So I find that Gish had not taken any drugs other than those prescribed, but whether Gish actually took Xanax the day of the killing is a disputed fact.

O'Donnell and Neuman (the two experts) agreed on the basic facts about Xanax, which they derived primarily from a review of medical literature. I accept their qualifications to testify about the reported effects of Xanax intoxication in the medical literature, but neither of them is an expert on Xanax or Xanax intoxication. Xanax is a benzodiazepine-class drug used to treat anxiety. A typical dose for anti-anxiety use for a first-time user would be .25 mg to .5 mg. Gish was prescribed 1 mg, two to four times a normal dose. Xanax can cause intoxication, with

effects similar to alcohol intoxication, and therefore it is a common drug of abuse. The half-life of Xanax is short, so its effects wear off in less than a day. Although Xanax is a central nervous system depressant, it can also cause a "paradoxical effect" triggering behavioral disturbances, including hallucinations, agitation, rage, and aggressive or hostile behavior. The paradoxical reactions are not necessarily dose-dependent. Neither O'Donnell nor Neuman estimated how common such paradoxical reactions were. Neuman also testified that interaction with Lamictal can amplify the effects of Xanax, including the paradoxical effects.

O'Donnell and Neuman disagreed about whether Gish was suffering from the effects of Xanax intoxication at the time of the killing. Neuman's opinion was that there is not enough information to determine whether Gish had taken Xanax the day of the killing. She also said that amnesia "would not be a side effect of a therapeutic dose." O'Donnell's opinion is that Gish was under the influence of Xanax, that it triggered a drug-induced psychosis, and that "he would have been deprived of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Ex. 1. I will credit O'Donnell's opinion this far: Gish was found in a confused, delusional state and he recovered in a matter of hours, which O'Donnell says is more consistent with Xanax intoxication than with an episode of psychosis induced by an underlying mental illness.

Opland-Dobs had about 11 years' experience when he undertook Gish's representation, and by the time of the hearing he had handled 15-20 homicide cases. He testified that because Gish had admitted the killing, the defense focused on sentencing mitigation. Nevertheless, Opland-Dobs did consider the defense of adequate provocation, which if established would result in a conviction for second-degree intentional homicide. Opland-Dobs also considered a

defense of not guilty by reason of insanity, but he concluded that he had no support for it. He discussed both of these defenses with Gish.

Opland-Dobs also considered whether the medications Gish had taken would affect his ability to control himself. Opland-Dobs was aware of the involuntary intoxication defense, but he had never raised the defense before and was not aware of any colleagues who had either. He made a formal request for research assistance on the effects of Lamictal, Ex. 10, and he inquired with colleagues and a psychiatrist to find out if Lamictal might have side effects that contributed to the crime. But Lamictal was a dead end. Ultimately, despite Gish's requests that Opland-Dobs consider some defense based on his medications, Opland-Dobs concluded that Gish had no viable defense to the homicide charge. Opland-Dobs testified that he did not consider whether Xanax might have adverse side effects, and he could not explain why he did not investigate Xanax as he had Lamictal. Opland-Dobs's practice is that he does not directly recommend that a client accept a plea offer, but leaves the decision to the client. He believed that the offer to Gish was reasonable under the circumstances, but not an especially good one.

Gish testified at the hearing that he had taken Xanax three times per day as prescribed from July 9 through the day of the killing. He did not say at what time he took the last dose before killing Litwicki. He also testified that he accepted the plea to first-degree reckless homicide because he believed, based on Opland-Dobs's advice, that he had no viable defense. He testified that he was not a violent person and that he believed that he killed Litwicki because of the medications he was taking. Had he known about the involuntary intoxication defense, and the potential side effects of Xanax, he would have rejected the plea and gone to trial, even if the chances of success with that defense were as low as one percent.

Brent Hart, the Greenfield detective who interviewed Gish, also testified. Video recordings of his interviews are in the record as Exs. 17 and 19; transcripts are Exs. 18 and 20. His hearing testimony established that no Xanax bottles or pills were found in the Gish/Litwicki residence after the killing.

ANALYSIS

Gish's claim of ineffective assistance of counsel is straightforward: Opland-Dobs should have investigated the effects of Xanax and informed Gish of the involuntary intoxication defense; had Opland-Dobs done so, Gish would have gone to trial. I evaluate Gish's claim under the familiar two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires Gish to show both that Opland-Dobs' performance was deficient and that Gish was prejudiced by the deficiency. Respondent contends that Gish cannot make either showing. Both sides assume that I will apply *Strickland* without deference to the state court because I concluded that the state court unreasonably applied federal law by denying Gish's request for a hearing. Now that I have provided that hearing, I will consider whether Gish has satisfied both of *Strickland*'s requirements.

**A. Motions in limine**

Before considering the merits, I must address two pending motions in limine, Dkt. 30 and Dkt. 31, but neither require extended discussion. First, Gish asks the court to consider O'Donnell's testimony about Gish's mental state, which Gish says would be permitted in state court. Wis. Stat. § 907.04 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). I will assume that an expert could testify about Gish's mental state, but I will deny

the motion because I conclude that O'Donnell's testimony on that issue is not adequately supported as required under Wis. Stat. § 907.02, for the reasons explained below.

Second, Gish asks the court to "clarify his obligations regarding privileged attorney-client materials." Dkt. 31, at 1. I will deny this motion as moot. Gish has not claimed as privileged any of the evidence on which I have relied in this opinion, and the respondent has not asked for the disclosure of any other documents or communication between Gish and Opland-Dobs. Gish has not asked the court to place any of the exhibits under seal. Gish has waived his privilege for any communication with Opland-Dobs on the subject of his mental-state defenses, and no further clarification is needed.

## B. Involuntary intoxication defense

To provide needed context for the application of the *Strickland* test to this case, I begin with an overview of the involuntary intoxication defense under Wisconsin law. At the time of Litwicki's killing, the defense was set out in Wis. Stat. § 939.42. (The statute has since been amended, but it is substantively the same.) In pertinent part, the statute reads:

> An intoxicated or a drugged condition of the actor is a defense only if such condition . . . [i]s involuntarily produced and renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed . . . .

The involuntary intoxication defense has two requirements: (1) the defendant's intoxicated condition was involuntarily produced, and (2) the intoxication rendered the defendant incapable of distinguishing right from wrong. *State v. Gardner*, 230 Wis. 2d 32, 37, 601 N.W.2d 670 (Ct. App. 1999). Intoxication is involuntary if it is produced solely by medication taken as prescribed; the defense is not available to one who mixes prescription drugs with alcohol or other drugs. *Id*. at 40; *State v. Anderson*, 2014 WI 93, ¶ 33, 357 Wis. 2d 337, 851 N.W.2d 760.

A defendant is entitled to a jury instruction on the involuntary intoxication defense if he proffers some credible evidence on both elements of the defense. *Gardner*, 230 Wis. 2d at 44-45, 601 N.W.2d at 676 (quoting *State v. Strege*, 116 Wis. 2d 477, 343 N.W.2d 100, 105 (1984)). If the defendant successfully raises the defense by adducing evidence on both elements, "the burden is on the state to prove the absence of the defensive matter to support a conviction for the crime charged." Wis. Criminal Jury Instructions § 775A Comments n.3 (2015). (The current instruction tracks the non-substantive amendments to the statute.) If the state does not meet its burden, "the result will be an acquittal on the charge." *Anderson*, 2014 WI 93, ¶ 25 (quoting 9 Christine M. Wiseman & Michael Tobin, *Wisconsin Practice Series: Criminal Practice and Procedure* § 17.25 (2d ed.)).

**C. *Strickland* analysis**

**1. Deficient performance**

Counsel provides deficient performance when he or she makes errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Gish contends that Opland-Dobs performed deficiently in this case by failing to investigate a potential defense of involuntary intoxication caused by taking Xanax.

Opland-Dobs testified, and as his contemporaneous notes show, that he specifically considered whether Gish's medications might have affected his mood and behavior. He requested "research into Lamictal and adverse reactions involving violence or mood disstability." Ex. 10, at 4. He simply didn't ask about Xanax, even though Gish had filled prescriptions for both Lamictal and Xanax at the same time. Gish himself urged Opland-Dobs to consider the effect of Xanax on his behavior; Gish even drafted part of an argument highlighting his recent prescriptions for Xanax and Lamictal. Ex. 8, at 11.

Respondent offers a reason why it would have made sense for Opland-Dobs to decline to pursue an involuntary intoxication defense: it would have failed. And the court of appeals has held that counsel has no duty to pursue a defense that is "theoretically possible [but] hopeless as a practical matter." *Evans v. Meyer*, 742 F.2d 371, 374 (7th Cir. 1984). But Opland-Dobs himself doesn't contend that he rejected an involuntary intoxication defense for strategic reasons based on his appraisal of the prospects of success. In this case, questions about trial strategy overlap with the question of prejudice. So I will assume that Opland-Dobs performed deficiently by failing to inform Gish of a possible involuntary intoxication defense and turn to the question of whether that failure prejudiced Gish.

### 2. Prejudice

A petitioner shows prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of a guilty plea, this means showing that there is a reasonable probability that, but for counsel's deficient performance, the defendant would not have pleaded guilty but would have insisted on going to trial. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012); *Moore v. Bryant*, 348 F.3d 238, 241 (7th Cir. 2003). In the context of this case, Gish must show that, had he been properly advised about the involuntary intoxication defense, there is a reasonable probability that he would have rejected a plea to first-degree reckless homicide and taken his chances at trial on the first-degree homicide charge.

Gish testifies now that, had he known about the potential adverse effects of Xanax and the involuntary intoxication defense, he would have gone to trial. But I must look beyond Gish's hearing testimony to see whether there is contemporaneous evidence to substantiate his currently expressed preferences. *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017).

One factor relevant to this analysis is the value of the plea deal. *Pidgeon v. Smith*, 785 F.3d 1165, 1173 (7th Cir. 2015) ("The terms of a plea deal are admittedly relevant in assessing the credibility of a petitioner's claim that he would have gone to trial had he received correct information at the plea bargaining stage."). Gish questions the value of the deal because he was sentenced to 40 years' incarceration, so he will be 77 when is released. But the question is whether Gish would have accepted the plea *before* he knew what his sentence would be. A defendant's dissatisfaction with the sentence imposed by the judge cannot satisfy the prejudice prong of the *Strickland* analysis, for that would unreasonably undermine the finality of a guilty plea, which the court is obliged to respect. *Lee*, 137 S. Ct. at 1967.

In this case, Gish was charged with a crime that carried a mandatory life sentence; he pleaded guilty to a crime that carried maximum prison sentence of 60 years, but no mandatory minimum sentence. So when Gish accepted the plea agreement, he gained the potential for a significantly reduced sentence, unquestionably an attractive prospect compared to mandatory life imprisonment. Opland-Dobs testified that the deal was "not a particularly good offer," but "[i]t was within reason." Dkt. 42, at 80. And he didn't say that Gish should have expected better under the circumstances. So the plea deal Gish received may not show conclusively that would have pleaded guilty even if he had known about an involuntary intoxication defense, but neither does it show that he would have rejected the deal.

In most cases, the most important evidence regarding prejudice is the strength of the defendant's case were he to reject the plea and proceed to trial. *Lee*, 137 S. Ct. at 1966. "[T]hat is not because the prejudice inquiry in this context looks to the probability of a conviction for its own sake." *Id.* Rather, it is because the court assumes that a defendant will act rationally under the circumstances. *Id.* at 1968. And a rational defendant who has "no plausible chance"

of an acquittal at trial is "highly likely" to accept a plea if the government offers one. *Id.* So, "[a]s a general matter, it makes sense that a defendant who has no realistic defense to a charge supported by sufficient evidence will be unable to carry his burden of showing prejudice from accepting a guilty plea." *Id.* The Supreme Court has applied this logic to cases involving the failure of counsel to advise the defendant of a potential affirmative defense. *Hill v. Lockhart*, 474 U.S. 52, 59–60 (1985) (in that situation, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial").

*Lee* recognizes that a defendant's chance of success at trial is not always decisive. In that case, the defendant had made it clear to his lawyer that deportation, not his chance of success at trial, was the "determinative issue" for him, but counsel failed to inform him before accepting a plea agreement that doing so would "would certainly lead to deportation." *Lee,* 137 S. Ct. at 168. So even though the defendant did not have a viable defense, his chances of avoiding deportation by going to trial were very low, but still better than if he pleaded guilty. Under those "unusual circumstances," the defendant could show a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation. *Id*. at 1967.

The reasoning in *Lee* is not instructive in this case because I find that Gish's original decision whether to plead guilty was based primarily on the prospects of success at trial. As he testified at the hearing, he chose to plead guilty because he was informed that he had essentially no chance of success. He says now that if he had believed he had any chance of success, even a remote one, he would have gone to trial. But nothing in his contemporaneous communication with Opland-Dobs indicated that any factor other than success at trial—such as the deportation at issue in *Lee*—would motivate him to go to trial despite overwhelmingly long odds. Although

Opland-Dobs informed Gish of other potential defenses such as adequate provocation and not guilty by reason of insanity, Gish made the rational choice to accept a plea deal rather than raise defenses that were doomed to fail. And Gish has not contradicted Opland-Dobs's testimony that Opland-Dobs did not make a plea recommendation to him, so Gish made the ultimate decision on his own. It follows that Gish would have made the same decision if Opland-Dobs had informed Gish about an involuntary intoxication defense but explained that he had no realistic chance of succeeding on the defense.[1]

With that framing context, I turn now to the question whether Gish has shown that he would have had any chance of succeeding on a defense of involuntary intoxication. Recall that to get a jury instruction on involuntary intoxication Gish must adduce credible evidence that (1) he was intoxicated by Xanax taken as prescribed, and (2) that as a result of the intoxication, he could not tell right from wrong.

As for the first element, there is some credible evidence. Gish had a prescription for Xanax and was directed to take a large dose for a first-time user. He told Opland-Dobs's research assistant soon after he was charged that he had in fact taken the Xanax as prescribed through the day of the killing. He was in a confused and delusional state when he was picked up about 5 a.m., but was lucid when he was turned over to police custody at 7:51 a.m.

I will assume that, had Opland-Dobs conducted his own investigation, he would have uncovered the same information about Xanax that O'Donnell provided at the evidentiary

---

[1] Gish also says now that he'd like the opportunity to clear his name with his children, in the sense that he wants them to know that he did not intend to kill their mother. But his name would not be cleared unless he were acquitted, so that is not really a consideration separate from success at trial. In any event, Gish's desire to clear his name would be the same regardless whether he was raising an involuntary intoxication defense, so it does not provide support for a belief that Gish would have rejected the plea deal had he known about the defense.

hearing. Specifically, Xanax can be intoxicating at the dose Gish was prescribed, and Gish's rapidly resolving delusional state after the killing is consistent with Xanax intoxication.

But a competent attorney advising his client would also consider all the weaknesses of Gish's proof on this element. Specifically, Gish told both a nurse and detective Hart that he had not taken Xanax the day of the killing; he also told them that he and Litiwicki had sold their pills for money to pay their rent. These statements are corroborated by the fact that the police found no Xanax pills or bottles at the house, a fact that Gish could not explain at the evidentiary hearing. (If he were taking the Xanax as prescribed, Gish should have had about 25 days, or 75 pills, left.) These clear weaknesses in a potential involuntary intoxication defense would have been apparent to Opland-Dobs and would have informed any objective assessment of Gish's options. But I cannot say that the credibility problems on this element are so pronounced as to utterly doom the defense.

Where Gish falters is the second element, which requires Gish to show that his intoxication rendered him incapable of telling right from wrong. There is simply no evidence to support that element of the defense.

A primary purpose of the evidentiary hearing was to give Gish the opportunity to show that Opland-Dobs, had he conducted an adequate investigation, could have discovered evidence suggesting both that Xanax has the potential to make someone incapable of distinguishing right from wrong and that Xanax had that effect on Gish. But Gish failed to show either of those things.

Both O'Donnell and Neuman testified that Xanax can lead to behavioral changes that include increased hostility and aggression. But hostility and aggression are not the same as the inability to tell right from wrong. *See, e.g., State v. Eggenberger*, 2013 WI App 128, ¶ 14, 351

Wis. 2d 224, 838 N.W.2d 866 (the side effects of Prozac, which include loss of judgment, reduced inhibition, and dementia-like symptoms, did not affect ability to tell right from wrong, and thus did not support involuntary intoxication defense).

O'Donnell took his opinion a step further, stating that Gish "would have been deprived of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Ex. 1, at 4. This is not necessarily the same thing as being incapable of distinguishing right from wrong. But even if I set aside the difference between O'Donnell's opinion and the statutory standard, I do not credit the opinion because it is completely unsupported. O'Donnell is pharmacist, and knowledgeable in general about drugs and adverse effects. But he is not an expert on Xanax intoxication, so he lacks the expertise to offer so specific an opinion about the effects of Xanax. I also find O'Donnell's opinion on this point to be conclusory and not adequately explained. He relied primarily on medical literature, but he did not point to anything specific in the literature showing that Xanax could have the effect he described. Competent, well-supported expert testimony might be admissible to show that Gish could not tell right from wrong. *Gardner*, 230 Wis. 2d at 42, 601 N.W.2d at 675. But O'Donnell's conclusory opinion on this point does not satisfy that standard.

O'Donnell also testified that he thought that Gish could not tell right from wrong because doctors at the hospital described him as "psychotic, and out of touch with reality, and delusional." Dkt. 42, at 53. And "[i]f a patient is psychotic, they're not able to think, and act, and conclude, and deliberate." *Id*. at 54. Nurses at the hospital described Gish as confused and delusional from about 6 a.m. to shortly after 7 a.m. But they do not describe him as "psychotic." In any event, neither O'Donnell nor Gish pointed to anything in the medical

records showing that Gish didn't know the difference between right and wrong, either while he was at the hospital or any time before that.

So Gish was unable to adduce any credible evidence at the hearing to support one of the elements of his defense. In contrast, the respondent pointed to compelling evidence that would defeat the defense: Gish's interview with detective Hart. In that interview, Gish clearly demonstrates the ability to think, conclude, and deliberate about the killing. It is true that, at one point in his interview with Hart, Gish said "I don't know. I couldn't think. I lost my mind. And I felt at the time that was the right thing to do." Ex. 20, at 11. Taken out of context, this statement might appear to support Gish's claim. But a review of the whole interview makes it clear that Gish knew what he was doing when he killed Litiwicki and he knew it was wrong at the time. His statement that he thought it was "the right thing to do" is a reflection of Gish's belief that his actions were *justified* by Litiwicki's alleged infidelity, not evidence that he was unable to appreciate the criminality of his actions.

At the beginning of the interview, Gish states that he does not remember what happened. (Again, neither expert testified that Gish's alleged amnesia could have been caused by a therapeutic dose of Xanax.) But at a certain point (at page 33 of Ex. 19), Gish says "Remember bits and pieces the more that I think about it." From that point on, he describes the killing in detail and explains his reasons for doing it. He had long suspected that Litwicki was having an affair with a young man whom they had taken in. He was angry because he believed that Litwicki was sexually unfaithful and she was spending Gish's money on the young man. And he tried to make sure no one heard the killing by pinning Litwicki under his knee. To be sure, he was in a rage when he killed her and still extremely angry when he made his statement to Hart. But the killing was motivated by Gish's outrage at how he had been wronged

by Litwicki's infidelity, which he did not deserve because he was a nice, generous guy. Gish had a keen sense that he had been wronged, and he thought the killing was justified: "And you know what? I don't regret it. I honestly don't for some fucking oddball reason, dude, I couldn't take it." Ex. 18, at 41. No one who hears Gish's whole statement to Hart could conclude that, at the time of the killing, Gish was unable to tell right from wrong.

Neither O'Donnell nor Gish himself explained how one could square an involuntary intoxication defense with Gish's statement to Hart. In fact, O'Donnell simply ignored the statement in his testimony.

All of this shows that Gish wasn't prejudiced by Opland-Dobs's failure to investigate or inform Gish about an involuntary intoxication defense. Had Opland-Dobs conducted an investigation into the effects of Xanax, he would not have discovered evidence adequate to support the defense. Rather, he would have discovered that the defense had no chance of success, which he would have communicated to Gish. And the problem is not simply that the jury would not have found the defense persuasive. It is that the jury likely would not even be instructed on the offense. A defendant is not entitled under Wisconsin law to raise any defense he chooses. Rather, he must first convince the trial court that he has some credible evidence of the defense. Based on the evidence presented here, a trial court would almost certainly conclude that Gish could not meet that standard for involuntary intoxication. And Gish would be in an even more precarious situation at that point: headed to trial without any defense and no plea deal on the table. Armed with the knowledge of how the defense would play out, it would not be rational for Gish to reject the plea deal that the state offered.

Gish's situation is close to that considered in *Evans*, in which the court concluded that the defendant could not show prejudice because "no lawyer in his right mind would have

advised [defendant] to go to trial with a defense of intoxication." 742 F.2d at 374. *Evans* involved voluntary intoxication, but the basic principle applies here: the defense of involuntary intoxication was merely a theoretical possibility, not a viable defense for Gish.

I conclude that Gish has not shown prejudice from Opland-Dobs' deficient performance.

## D. Certificate of appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted). I cannot say in this case that Gish has not made a substantial showing of a denial of a constitutional right. Other judges might disagree with the conclusion that petitioner is not entitled to withdraw his plea. Accordingly, a certificate will issue.


ORDER

IT IS ORDERED that:

1.  Christopher Randolph Gish's motions in limine, Dkt. 30 and Dkt. 31, are DENIED.

2.  Gish's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

3. A certificate of appealability shall issue.

4. The clerk of court is directed to enter judgment and close this case.

Entered February 19, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge